SIGAL CHATTAH
Acting United States Attorney
District of Nevada
Nevada Bar Number 8264
JUSTIN J. WASHBURNE
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Fax: (702) 388-6418
justin.washburne@usdoj.gov
*Attorneys for the United States*

FILED ___ RECEIVED
ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

JUL 3 0 2025

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID RALPH WEBBER,<br><br>Defendant. | **CRIMINAL INDICTMENT**<br><br>Case No. 2:25-cr-229-JAD-EJY<br><br>**VIOLATIONS:**<br><br>Introduction of a Misbranded Drug into Interstate Commerce (21 U.S.C. §§ 331(a), 333(a)(2))<br><br>Wholesale Distribution of Prescription Drugs without a License (21 U.S.C. §§ 331(t), 333(b), and 353(e)(2)(A))<br><br>Smuggling (18 U.S.C. § 545) |

**THE GRAND JURY CHARGES THAT:**

At times material to this Indictment:

### INTRODUCTORY ALLEGATIONS

#### Defendant and His Companies

1. Defendant DAVID RALPH WEBBER, a resident of Henderson, Nevada, owned and operated two Nevada companies: Passion Plus Enterprises Inc. ("Passion Plus") and Whole Science Health.

1

2. WEBBER was neither registered as a pharmaceutical manufacturer with the FDA, nor licensed in District of Nevada, or any state, as a pharmacist, medical practitioner authorized to administer prescription drugs, or as a wholesaler of prescription drugs.

3. From at least 2018 to the present, WEBBER used his companies to import misbranded prescription drugs containing the active pharmaceutical ingredients sildenafil and tadalafil into the United States in the form of capsules that were manufactured in India at facilities that were not registered with U.S. Food and Drug Administration ("FDA") as required under the Federal Food, Drug, and Cosmetic Act ("FDCA") Title 21, United States Code, Section 301, *et seq.*

### The FDA's Regulation of Drugs

4. The FDA was the agency of the United States charged with the responsibility of protecting the health and safety of the American public by enforcing the FDCA. One of the main purposes of the FDCA is to ensure that human drugs sold in the United States were safe and effective for their intended uses and bore labeling containing complete, true, and accurate information. The FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce. The FDA's responsibilities also included inspecting facilities, whether domestic or foreign, where drug products were manufactured, labeled, and packaged; examining the records at such facilities to determine whether the drugs were manufactured, labeled, and packaged under conditions whereby their quality could be assured; examining the facilities and controls used; and, where appropriate, preventing products that were improperly manufactured, labeled, and packaged from reaching the marketplace.

5.  In order to legally market a drug in interstate commerce, the drug's manufacturer was required to comply with all applicable provisions of the FDCA and its implementing regulations.

6.  The FDCA defined the term "drug" to include (a) articles that were "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" in man; and/or (2) articles (other than food) intended to affect the structure or any function of the body of man. 21 U.S.C. § 321(g)(l)(B) and (C).

7.  Some drugs regulated by the FDA were considered "prescription drugs." A "prescription drug" was any drug that, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug"; or any drug that was "limited by an approved application . . . to use under the professional supervision of a practitioner licensed by law to administer such drug. 21 U.S.C. § 353(b)(l). A drug approved as a prescription drug was required to bear the symbol "Rx only" on its label. 21 U.S.C. § 353(b)(4)(A).

8.  Under the FDCA, the term "label" meant a display of written, printed, or graphic matter upon the immediate container of any article. 21 U.S.C. § 321(k).

9.  Under the FDCA, the term "labeling" meant all labels and other written, printed, or graphic matter (a) upon any article or any of its containers or wrappers; or (b) accompanying such article. 21 U.S.C. § 321(m).

10. The FDCA required any establishment that engaged in the manufacture, preparation, propagation, compounding, or processing of a drug to register with FDA in accordance with 21 U.S.C. § 360. The failure to register was a prohibited act under the FDCA. 21 U.S.C. § 331(p).

3

11. "Wholesale distribution" of drugs requiring a prescription meant the distribution to a person other than a consumer or patient, or receipt of such drugs by a person other than the consumer or patient, unless a specified exception applied. 21 U.S.C. § 353(e)(4). A "wholesale distributor" was "a person (other than a manufacturer, a manufacturer's co-licensed partner, a third-party logistics provider, or repackager) engaged in wholesale distribution." 21 U.S.C. § 360eee(29).

12. The FDCA prohibited engaging in wholesale distribution of any drug requiring a prescription without the appropriate license. 21 U.S.C. § 353(e)(1)(A).

13. The FDCA prohibited the introduction or delivery for introduction into interstate commerce, or the causing thereof, of any drug that was misbranded. 21 U.S.C. § 331(a).

14. Under the FDCA, a drug was deemed to be misbranded:

    a. if its labeling was false or misleading in any particular, 21 U.S.C. § 352(a); or

    b. if the label did not bear the established name and quantity of each active ingredient, 21 U.S.C. § 352(e)(l)(A); or

    c. if it was manufactured, prepared, or processed in an establishment not duly registered with the FDA, 21 U.S.C. § 352(o); or

    d. if it was a prescription drug and its labeling "failed to bear adequate directions for use" under which a layperson could use the drug safely and for the purposes for which it was intended. 21 U.S.C. § 352(f)(1); 21 C.F.R. § 201.5.

### The Drugs

15. "Viagra®" was a drug within the meaning of 21 U.S.C. § 321(g)(1), and a prescription drug within the meaning of 21 U.S.C. § 353(b)(1). Viagra was the brand name

1    for Pfizer, Inc.'s FDA-approved erectile dysfunction drug containing the active
2    pharmaceutical ingredient sildenafil.

3        16.    "Cialis®" was a drug within the meaning of 21 U.S.C. § 321(g)(1), and a
4    prescription drug within the meaning of 21 U.S.C. § 353(b)(1). Cialis was the brand name
5    for Eli Lilly & Company's FDA-approved erectile dysfunction drug containing the active
6    pharmaceutical ingredient tadalafil.

7        17.    The FDA's approval of Viagra and Cialis was limited to use under the
8    professional supervision of a practitioner licensed by law to administer such drug; therefore,
9    Viagra and Cialis were "prescription" drugs under 21 U.S.C. § 353(b)(1). Due to toxicity
10    and other potentially harmful effects (*e.g.*, life-threatening drops in blood pressure, painful
11    erections that result in permanent injury to the penis), drugs similar to Viagra and Cialis
12    were not safe for use except under the supervision of a practitioner licensed by law to
13    administer them, and were thus prescription drugs as well.

14        18.    Drugs containing the active pharmaceutical ingredients of sildenafil and
15    tadalafil were prescription drugs because of their effect on the human body. Sildenafil and
16    tadalafil opened capillaries, which increased the blood flow and heart rate. Clinical trials
17    resulted in the posting of possible adverse reactions in all sildenafil and tadalafil product
18    literature. Licensed practitioners were warned that persons on heart medications (such as
19    Plavix) and/or blood-thinning medications (such as Coumadin) could suffer a heart attack
20    or stroke if they used sildenafil or tadalafil.

21                     <u>Defendant's Distribution of the Misbranded Drugs</u>

22        19.    WEBBER purchased from manufacturers in India hundreds of thousands of
23    capsules containing sildenafil and tadalafil. To conceal the purpose of his payments,
24

WEBBER falsely declared that the wire transfers to these manufacturers were for business management consultancy services.

20. To evade customs detection and enforcement, WEBBER caused the manufacturers in India to send the capsules with shipments containing false declarations of their contents.

21. After several shipments addressed to WEBBER and his companies were confiscated by customs, WEBBER caused the manufacturers in India to send the capsules in small shipments to a network of straw recipients located in the District of Nevada. WEBBER then collected the capsules from this network of individuals and paid them for receiving packages on his behalf.

22. WEBBER paid a packaging company to label the capsules according to his instructions. The capsules were labeled with a variety of names including "Ride," "Kinky Kong," "Stif," "TBone," and "Kinky Pink." Despite the variety of names, scientific analyses of the capsules sold by WEBBER revealed that virtually all of the capsules contained similar doses of sildenafil and/or tadalafil, the active pharmaceutical ingredients in the FDA-approved prescription drugs Viagra and Cialis.

23. WEBBER caused the capsules to bear labels with a fictitious list of ingredients and false claims that the drugs were "100% Natural" and did not require a prescription. The labeling did not disclose the active pharmaceutical ingredients sildenafil and tadalafil, did not contain an "Rx Only" marking, and did not bear adequate directions for use or adequate warnings.

/ / /

/ / /

/ / /

 

*Representative Example Labeling of WEBBER's Capsules*

24. WEBBER sold the misbranded prescription drugs to retailers such as smoke shops, convenience stores, and adult novelty stores in the District of Nevada and throughout the southwestern United States.

25. WEBBER also sold the drugs directly to consumers through a website he operated.

26. The retailers and individual consumers who purchased pills from WEBBER were unaware that the pills contained prescription medication, often in amounts exceeding twice the maximum recommended dose, and were processed by unregulated manufacturers in India.

27. WEBBER was a wholesale distributor of drugs in the District of Nevada, but he knew that he was not properly licensed by Nevada, or any other state, to conduct this activity.

7

28. WEBBER shipped misbranded prescription drugs in interstate commerce via United States Postal Service and via commercial interstate carriers, including FedEx, to fulfill orders he received from customers through his website.

29. In total, WEBBER made more than $2.5 million dollars in revenue from his sales of misbranded prescription drugs.

## COUNT ONE
### Introduction of a Misbranded Drug into Interstate Commerce
### (21 U.S.C. §§ 331(a), 333(a)(2))

30. The factual allegations in Paragraphs 1 through 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

31. On or about January 24, 2022, in the State and Federal District of Nevada and elsewhere,

**DAVID RALPH WEBBER,**

defendant herein, with the intent to defraud and mislead, introduced and delivered for introduction into interstate commerce and caused to be introduced and delivered for introduction into interstate commerce a prescription drug, that is, four 24-count bottles and four individually packaged pills containing sildenafil shipped from Las Vegas, Nevada to Santa Ana, California, which was misbranded within the meaning of 21 U.S.C. § 352(a), (f), and (o), in that it bore false and misleading labeling, lacked labeling that contained adequate directions for its use, and was manufactured, prepared, propagated, compounded, and processed in an establishment not registered with the FDA, all in violation of 21 U.S.C. §§ 331(a), 333(a)(2).

///

///

///

## COUNTS TWO TO FIVE
Wholesale Distribution of Prescription Drugs without a License
(21 U.S.C. §§ 331(t), 333(b), and 353(e)(2)(A))

32. The factual allegations in Paragraphs 1 through 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

33. On or about the dates below, in the State and Federal District of Nevada and elsewhere,

**DAVID RALPH WEBBER,**

defendant herein, knowingly engaged in the wholesale distribution of the prescription drugs described below in interstate commerce, and willfully caused the wholesale distribution of prescription drugs in interstate commerce, without being licensed by the state of Nevada, or any other state, to do so, each distribution a separate violation of 21 U.S.C. §§ 331(t), 333(b), and 353(e)(2)(A):

| COUNT | DATE | PURCHASER | DRUGS DISTRIBUTED |
|---|---|---|---|
| TWO | 1/11/2023 | Company A | Approximately 10 boxes, each containing 24 bottles of sildenafil and/or tadalafil; and<br><br>Approximately 40 packs, each containing six capsules of sildenafil and/or tadalafil |
| THREE | 2/20/2023 | Company B | Approximately 28 boxes, each containing 24 bottles of sildenafil and/or tadalafil |
| FOUR | 3/10/2023 | Company C | Approximately 20 boxes, each containing 24 bottles of sildenafil and/or tadalafil |
| FIVE | 3/16/2023 | Company D | Approximately 434 boxes, each containing 24 bottles of sildenafil and/or tadalafil |

## COUNTS SIX TO TWELVE
Smuggling
(18 U.S.C. §§ 545)

34. The factual allegations in Paragraphs 1 through 29 of the Indictment are incorporated by reference and realleged as though set forth fully herein.

35. On or about the dates below, in the State and Federal District of Nevada and elsewhere,

**DAVID RALPH WEBBER,**

defendant herein, and others known and unknown to the Grand Jury, aiding and abetting one another, fraudulently and knowingly imported and brought merchandise, namely, parcels of unlabeled bulk sildenafil and/or tadalafil, into the United States contrary to law, that is, with labeling that was false and misleading as to the parcels' contents, labels that did not contain accurate statements of the packages' contents in terms of weight, measure, and numerical count, and labeling that did not bear adequate directions for use, contrary to 21 U.S.C. §§ 331(a) and 352(a)(1), (b), (f), and received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, each importation a separate violation of 18 U.S.C. § 545:

| COUNT | DATE | FROM | TO | FALSELY DECLARED AS |
|---|---|---|---|---|
| SIX | 9/5/2023 | India | Las Vegas, Nevada | Hemo Life, Livo Life |
| SEVEN | 9/5/2023 | India | Las Vegas, Nevada | Vaji Vati, Hemo Life |
| EIGHT | 9/12/2023 | India | Las Vegas, Nevada | Jeeva Vati, Vrishya Vati |
| NINE | 9/14/2023 | India | Las Vegas, Nevada | Vaji Vati, Rhuemo Life |
| TEN | 10/31/2023 | India | Las Vegas, Nevada | Ayurvedic Medicines |

| COUNT | DATE | FROM | TO | FALSELY DECLARED AS |
|---|---|---|---|---|
| ELEVEN | 11/2/2023 | India | Las Vegas, Nevada | Almo Life, Livo Life, Hemo Life |
| TWELVE | 11/5/2023 | India | Las Vegas, Nevada | Vaji Vati |

**DATED:** this 30th day of July, 2025.

**A TRUE BILL:**

/S/
FOREPERSON OF THE GRAND JURY

SIGAL CHATTAH
Acting United States Attorney

_[signature]_
JUSTIN J. WASHBURNE
Assistant United States Attorney

11